Amgen v. Sanofi Give them a minute to settle down. Good morning, your honors, and may it please the court. Paul Clement for the appellants. Amgen has broadly claimed an entire genus of antibodies based on their functional ability to block the interaction of a well-understood antigen, PCSK9, and the LDL receptor. Nothing in Amgen's specification or claims materially advanced the state of the science. Both the existence of the PCSK9 and the existence of a target region on the PCSK9 or epitope that would allow an antibody to block the PCSK9-LDLR interaction were well understood at the time. Were the amino acids in that target region identified before this? They had not been identified at that point, but also people who were doing the process of trying to identify human antibodies did not use the 15 amino acids that were identified on the epitope to usefully do anything in particular. Once this was disclosed, it didn't change the way people went about identifying and trying to find additional antibodies. It didn't even change the way Amgen went about trying to identify additional antibodies. I didn't quite understand that. Before this, people were not using this 15 amino acid region in finding antibodies? I think I may have misunderstood what you said. Before this, they weren't using that, and after this, they weren't using that. Knowing that there happened to be 15 amino acids that make up the epitope doesn't help you find additional antibodies in any way. As a practical matter, this didn't disclose anything useful. The other problem, of course, with simply identifying the amino acid structure of the epitope is that's not the invention. That's not what they claim. What they claim is essentially the entire genus of PCSK9 inhibitors. The fundamental problem here is that when you describe, even in some detail, the epitope, and then you provide two species, that doesn't satisfy written description, we say as a matter of law, but the particularly acute problem in the way the trial proceeded is we weren't even able to put on the critical piece of evidence that this court used in AbbVie to determine that there wasn't sufficient representation among the species. If you look at page 1293 of the Fed Third, in the AbbVie decision, there's a big chart that shows essentially how Stelera was very different from the disclosed antibodies. I understand that. There's a little confusion for me in the briefs and what you and your friend are saying as to whether or not the determination by the district court to not include that evidence was a legal determination because of how she construed, in your view, misconstrued our case law, or whether or not it was just an evidentiary determination. It would confuse the jury. It was irrelevant. It was cumulative. How do you see her determination in that regard? We see her determination as based fundamentally on a fundamental misconstruction about rules of post-priority evidence. I'm happy to talk about why we think that is misguided to a fairly well, but just to be clear, the suggestion that there was some sort of alternative rule 403 alternative there is simply wrong. Under Third Circuit case law that I think would govern this particular question, it's a reversible error for a district court to exclude on the basis of rule 403 without going through the balancing that's actually required by rule 403. That evidentiary ruling can't stand on this sort of phantom alternative ground. It stands on a fundamentally misguided idea that based, I guess, on this court's Hogan decision or the prior court's Hogan decision, that you just can't have this kind of evidence of the accused antibody. It wasn't just the accused antibody we wanted to show the jury. We also wanted to show other antibodies that were within the genus. We wanted to show the jury how structurally diverse these were. Of course, as I alluded to, that was the critical evidence that this court relied on on page 1293 of its decision in AbbVie. I think that if we'd been able to show that, it would have fundamentally changed the determination because if you think about what the jury was asked to do here, they're asked to decide whether or not the two specific antibodies that are claimed, and there's a debate whether it's 2 or 24, but there are two that you actually have the x-ray crystallogy for and you know exactly where they bind. Well, they're asked to decide whether those two species are representative, looking only at those two species. Can I ask you, what is your view of what these might be representative of? It seems to me to say representative, you need another property. Otherwise, all you have is, I don't know how many amino acids long these things are and every possible numerical combination, which is an extremely large number and nothing would be representative of anything else. What is the concept that might even theoretically lead you to say, okay, I've got the following 1,000, they're representative of 20 to the 64th or something power. What's the concept? Well, I think the concept that's supplied by Ariad is that they need to be representative of the structural diversity of the genus. Now, I think as your question suggests, that when you do as Amgen did here and you claim a nearly infinite genus, you're going to have an awful lot of trouble finding representative species. But it wasn't foreordained that they claim a genus that broad. Representative of structural diversity, it seems to me, I'm still not beyond the sheer number of 20 amino acids at possibilities at every one of however many spaces. What is it representative of? Well, here it's not. Maybe I can try to answer the question by hypothesizing what they could have claimed. What they could have claimed is they could have taken their two species that they actually did claim in the specification and they could say, and we claim essentially every antibody that has 95% of the same structure. Now, if they've done that, then you could at least, I think, argue that it would be what they disclosed actually was representative of the genus that they claimed because it would have that overlapping structure. But when you claim every single thing that binds to an epitope, then I think you're setting yourself up for failure. Please don't blame me. I didn't set forth the terms of the claim of the genus. Amgen came in and they wanted to claim everything that was essentially that would block at the epitope. I think they set themselves up for failure because I don't think they can identify a common structural feature of everything that binds at the site. What aspects of the difference in structure beyond its ability to bind does anybody care about? Well, I have to stop you right there because I don't think the ability to bind at the site is structure. I think it's function. I think it's the classic function that they've claimed here, which is what everyone was looking for. The function of blocking. I'll change the word aspect to property. What property of the structure beyond the property of being able to bind to the epitope and then the second condition of the claim, namely the block, the PCSK9 from interfering with the liver cells, does anybody care about? What does the evidence say? Traditionally, people have cared about the amino acid sequences. Why? Because that's traditionally how you've claimed essentially antibodies for years and years and that maps on to how you claim small molecule drugs as well. You claim them by their chemical structure. Is there evidence in this case from, presumably it would be your experts, that say differences in the structure of PCSK9 binding antibodies could have different effects on human beings in the body when you give it to them as a medication? There actually is evidence to that effect. I don't know that it's actually ultimately material. In my view of the case, it may be material to you. There's a whole dispute below about the blocking properties of the various antigens. Essentially, there was the issue that the two disclosed antibodies are allegedly edge blockers, which is to say, if you think about the 15 amino acids that make up the epitope, they essentially bound on one edge or the other. If we could have shown the jury this, which we couldn't, but our product, the accused product, Pralulin, actually happens to block in the center. I believe that there was some testimony, certainly we would have been happy to proffer it, that there actually are some advantages to having a center blocker rather than an edge blocker. Honestly, I don't think that's relevant. I think what's relevant is the broader principle that you cannot claim everything that blocks on an epitope simply by describing the amino acids that make up the epitope and two species of antibodies that make up a nearly infinite genus. Let me just, I guess, ask what I keep thinking of as maybe the same question. Why should that be the rule that you have to specify the actual chemical structure, the amino acids, as opposed to if truly every single one of the trillions and trillions of polypeptides would, in fact, have all the same properties of any interest anybody has been able to identify? Here's the answer, Judge Tronto, and I hope this is responsive. Just because two substances, two antibodies, block at the site, that doesn't somehow make them biosimilars or fungible for all purposes. They are still very different chemical structures, and what we wanted to show and weren't allowed to is ours has a radically different structure, and it only shares 26% of the amino acid sequences in the CDRs. That's what we wanted to show. That can have all sorts of differences, and a great illustration of that is that Pfizer also had an antibody. This is discussed in the amicus brief. Pfizer also had an antibody that blocked at the site. The problem was that when Pfizer tried to take that antibody and tried to manipulate it so it could be FDA approved, it failed the trials. Imagine what would have happened if Pfizer had been the first one to identify the 15 amino acids on the epitope? You would now, instead of having two useful medicines on the market, you'd effectively probably have zero, because the party that had claimed the epitope would have been able to block everybody's antibody, even very different chemical antibodies, even though their antibody, their species, doesn't work as medicine. We wouldn't want that in the small molecule space. It's a happy world that there are multiple statins on the market, but they all operate in the same basic way. Can I ask you about, move on to a related question which deals with the jury instruction? Yes. It's a little troubling, a little hard when the district court essentially, in reaching her jury instruction, was plugging out sentences from opinions that some of us have written, including me, to then turn around and say she's wrong. Now, your answer to that is, maybe correctly, that that was all dicta, and so that we can now disassociate ourselves from those remarks and say the instruction was wrong, but what more do we have? Well, I think you have more than that, Chief Judge Prost. First of all, I do think, and my friend on the other side describes this as nitpicking in his brief, but I don't think it is, and I think it maps on directly to what the court said in footnote four of Senecor, which is, even if you're going to assume for a second that the newly discovered, newly characterized antigen instruction is good law, and I'd eventually like to tell you why it really is time to just end the madness and say it's not, but even if you assume that's good law, the key to making it work is that the generation of antibodies has to be routine. Now, but as this court, I think, made crystal clear in Senecor, and I think footnote four makes this point, what has to be routine is the generation of the claimed antibodies, and the word claimed, which I think is what is in this court's cases, was not in the instruction, and so if the question is, and it matters a lot, because the generation of antibodies that don't actually block at the site, that don't have the characteristics, that is routine, I suppose, but to generate human antibodies that block at the desired site, that's not routine at all, and indeed it's a process, it's an arduous process of trial and error that my clients were involved in, that Amgen was involved in. When Amgen came out with this invention, it didn't change what they did as a practical matter, they still had to engage in the same trial and error process. That was additional evidence that went to enablement, in our view, that we weren't able to put in front of the jury because of this misguided priority ruling. So the instruction doesn't follow this court's cases, and the distinction isn't a nitpick, it's absolutely critical, and I think it actually maps on to how I read this court's decision in Senecor, which is it said, well, that instruction doesn't apply here for among, I think, two reasons that are both fully applicable here. One is the generation of antibodies for human antibodies was not routine, that's footnote four. The other thing, of course, this court said there was that the relevant antigen wasn't newly discovered. Well, that's 100% true here. PCSK9 was not some invention of Amgen. Why putting aside just sort of the words of the prior precedents, why should there be a difference between newly discovered and newly characterized? Well, I misspoke, I mean, I don't think there is a difference, which is why I suppose I slipped from one to the other. The point is, they didn't newly characterize PCKS9. I thought you said the identification of the 15 listed amino acids was not known until this. The exact amino acid structure of it wasn't, but the idea that there was an epitope on PCSK9 was well understood. But of course, what the instruction in the case law talks about is not a newly characterized epitope, which is the 15 amino acids. It talks about a newly characterized antigen, which is PCSK9, the whole big thing. That wasn't newly characterized at all. Everybody knew that was out there. Everybody was trying to do the same thing, which is to come up with a human antibody that blocked the interaction between PCSK9 and the LDL receptor. Both before and after this invention, that was a trial and error process that required essentially well understood techniques, but techniques that were arduous and required trial and error. The critical thing to understand here is just finding out that, okay, well there's 15 amino acids that make up this particular epitope. That didn't make it any easier. It didn't change the way people were going about this, and again, it didn't even change the way Amgen was going about this, which was one of the many things we weren't able to put in front of the jury. I would like to just take a moment, though, to sort of say that I think this court, in the Senate court decision, and I've reviewed the oral argument in that case, and I know it was a focus of the oral argument in that case, I think there's an excellent argument that at least if you're trying to transfer the newly characterized antigen and the so-called antibody exception to the human antibodies, it just doesn't work. It's based on a 1976 textbook, and the science just doesn't map on to the way the reality works today, at least if you're talking about human antibodies. As this court said in the Senate court, maybe it makes a little bit of logic to say that if you discover a keyhole, and that easily and routinely translates to one key, you can claim the keyhole and the key. But as this court put it in Senate court, even if you have the keyhole, there's a ring out there with a million keys on it, and it really doesn't do you much good to simply describe the keyhole. So I think for that reason, the science doesn't support it. I'd also like to make a humble point that the law doesn't support it. The written description is a requirement that you describe the invention. The invention that's claimed here is an entire genus of antibodies. They don't claim that they invented the sweet spot or the epitope or the 15 amino acids, nor could they in a post-myriad world. So even, and again, this is another aspect in which what's going on here is actually not what this court has talked about in its prior cases. This court talked about in its prior cases a hypothetical possibility where somebody could claim the newly discovered antigen and the antibodies that went with it. Now in a post-myriad world, I think it's common between the parties that you can't actually claim the epitope. No matter how many amino acids it makes up, it's in nature, you can't claim it. But if you're no longer claiming the antigen, then you've completely untethered what you're describing from what the statute requires you to describe. The statute requires you to describe your invention. The target of your invention, the problem you're trying to solve, is not your invention. And so no matter how much they describe in atomic level detail, as they like to say, the structure of the epitope, it doesn't matter. What they need to describe is their invention. What they claim is this entire genus of antibodies, and they haven't adequately described that. And just to go back to first principles, what Ariad tells us is they have to show a common structure. There is no common structure, or they can show it by these representative species. But as I alluded to earlier, it's representative species of the full structure that makes up the genus. And we don't think two can get that done. We think we should prevail as a matter of law based on the four corners of the specification. Can I just ask you, before you sit down, about the matter of law point. I haven't been able to find, do you have a case that says complete non-making of a 50A motion? Just not a matter of interpreting a couple of words, but just, you just never ever made a 50A motion by words or on paper. That that can be essentially excused on the ground that everybody knew this case was about sufficiency of the evidence. Yes, we have third circuit case law, and I think we cited it in our brief. I don't have it at the ready, but I will tell you that the case law that they cite in response to that, the Dura-Last case, doesn't help them at all. I mean, Dura-Last, I think, essentially drew exactly this distinction, which is to say, look, if things were being handled in a relatively informal way, and they were here in the sense that, you know, we had one page briefs, and we were basically told, don't worry about it, I get your objection, it's preserved. When things are being done that way, the law in the third circuit, which is what's relevant here, says that you can, as long as you do something, that sort of puts everybody in. That's right. I tried to frame my question as, I'm not sure you did anything on, on, on this. Oh, but, but we didn't, we, we did. We did, we, we essentially objected to the sufficiency of the evidence. We made clear that that was our objection, and we were essentially told by the district court judge, yeah, I got your, I got your objection. My point is, that's enough, there's no, there's nothing that sort of says that it has to rise like to this level of formality, and then we'll take it to the next step. You just have to do something essentially to apprise the, the court, and then you can treat it as a constructive 50A motion. So we think we, we, we satisfy that. The Dura-Last case addresses something completely different. It's a situation where they filed a formal 50A motion, and they just didn't include obviousness as one of the claims, and then the court said, well, we can't stick it in there for you. And I think in a way that that distinction actually makes some sense, is because the first, certainly in terms of the role of the reviewing court, the first one really flows sort of directly from the degree of formality that the district court wants to sort of run his or her court with. And if they're, you know, doing this in a way that makes clear that everybody sort of gets the idea that the fundamental issue here is, we don't think there's sufficient evidence to see this. We've made this clear from the beginning, and we continue to make that clear. If, if, if the district court judge doesn't want formal motions on that, I mean, so be it. And I, I certainly think once she found in the J. Moll motion that we preserved it, and then went on and addressed the merits for 16 pages, that ought to be enough for this court. In contrast, the Dura-Last situation, which this court also said isn't regional circuit law, but federal circuit law, there, you know, if it's, if you got a 50A motion, we can't put something in there that's not. That really doesn't sort of address the same degree of deference to the district court. So I actually think that distinction makes a, makes a world of sense. Thank you. We'll restore some rebuttal time. Good morning, and may it please the court. I have not done this before, but I think this is the rare case in which a demonstrative would actually be helpful. Which is to say, here's the structure. By the way, these are demonstratives that were used in front of the jury by Amgen's expert witnesses. They're based, they were 3D printed based on the x-ray crystallography provided in the patent. This is one of the antibodies in the patent. This is PCSK9. And in terms of what was actually discovered, when Amgen started its research, all that was known was that PCSK9 affected cholesterol in some way. It was not known how. Amgen determined, and the record shows the following, first, that the effect was that PCSK9 bound to what's called the LDL receptor, and that had the ultimate effect through biological pathways of destroying the LDL receptor, which then led to higher cholesterol. Amgen determined that the part of PCSK9 that bounded the LDL receptor is what we're now calling the sweet spot, the part that's in pink here, the 15 epitopes out of almost 700. It then determined that this was antigenic, the sweet spot, meaning that an antibody could bind there. Amgen then developed specific protocols for creating monoclonal antibodies that would have the requisite structure to bind and characteristics to bind to the sweet spot. So if you take these, for example, this again, this is one of the antibodies in the patent. This is the PCSK9 sweet spot. As you can see, they have peaks and valleys and ridges and nooks and crannies, and to fit together, they have to have the shape complementarity. They're two pieces of a three-dimensional jigsaw puzzle. So that for these to fit together, there's a larger piece that goes here, it touches there, and then rolls over, and at that point, they come together very tightly, tightly enough to allow the chemical bonds to form, which is what then causes them to have affinity, to bind together instead of just bouncing off of one another. And that's why there is so much disclosure in the claims here. First, the claims refer to a monoclonal antibody, which is well understood to have the characteristic Y-shaped structure of a monoclonal antibody with constant and variable regions. Almost all of any antibody is the same. The main difference is here in the tips, the business ends, and that is where you get the sweet spot. And you then know, as these two fit together, that disclosing the structure of this gives you all of the important common structural features of this. That's how they fit together. But how do we know that those pink structures in the two you have and have had are the same exact structures as all the other antibodies? I mean, are they all exactly that three-dimensional shape, or are they going to form the same way? Or do they touch on part but not all of that structure? There can be differences, but they have to have the common structural features. It depends on which test we're talking about. But if we're talking about, say, common structural features, they all have the common structural features to allow this. And I should emphasize also that... But isn't it important if there are, I don't know, is this the case where there's like 15 of these things? Let me just make it even more simple because I'm going to get the science wrong if I try to even talk about it. If your position is that it doesn't have to match up 100% every single one, which I assume it is, that they don't all work exactly the same way, isn't it your duty to show that the structures are sufficiently similar that they don't have any other kinds of effects or the like? Or are you just saying anything that hooks up with that is sufficient to show written description? No, it's not just anything. It's anything... Again, there are the multiple tests for written description. I could roll through them. But in terms of, say, the middle one, common structural features, it doesn't mean that they're identical. It means that the disclosed antibodies have the common structural features that others would. Right. So what if you have one that only touches on the middle portion of that? And then you have one that touches on one end? They're still hooking up. Maybe they still are hooking up enough to function the way your patent explains. But is that a common structure? Because they do have to have... And so, for example, if you look at the antibodies in the patent... And by the way, I will say, again, it's a question of fact. And Emgen's experts, Petsco and Reese, testified contrary to absolutely everything that you heard from counsel earlier this morning. And that's substantial evidence the jury was entitled to credit. But if we roll through the tests... In terms of your example, where your claim says, assuming there are 15 little pink nodules on the... Let's call that blue. That all you need on the Y ends is something touching one of those. And the effect of that is that that blue thing will then not bind to the liver. So that you're not claiming only what fits nice and snug. Fitting like this, as long as it has the effect of blocking the liver binding, satisfies your claim. And you've claimed everything within that genus. One of the important things that the experts testified about, too, though, is that these don't... You don't bind to just one residue. Your claim says you can. Well, the claims refer to...  Some claims specify binding to one residue. But the key point is that for these to get close enough for that to actually happen, for the chemical bonds to form, what we're talking about is complementing the surrounding region. You're not just going to bind to any one uptote. You have to bind to the surrounding region for sufficient chemical bonds to form for there to actually be binding. One of the record sites for that is appendix page 1256, transcript page 608, line 22. But also... See, this is what I don't quite understand. Let's assume that the two you have bind at regions one, two, and three. And that's the structure you can show based upon your patent, your specification, whatever evidence you have. And they were precluded from showing that theirs all bind at 13, 14, and 15, which are completely non-overlapping regions. Why is that the same structure? Sure. Now, I'm going to... And forgive me if I get the science wrong. I'm not going to fight the hypothetical. We don't agree with some of the premise there about completely. But in terms of the district court's ruling on this, which Judge Prost had asked about, the so-called phantom ruling on rule 403 shows up in a couple places during the trial. But what the court explained, and this is page 1157 to answer your question, transcript page 20, it starts around line seven, is the court explained that they didn't need specific examples to prove the absence of fact. Their experts testified that the sweet spot is this area that I just showed you. And they argued that exactly what you just said, which is that the specifically disclosed examples cover some parts of the sweet spot, not another. The district court pointed out, your experts testified to that, to prove the alleged absence of something, the alleged absence of something that binds to the middle, for example. You don't need to put in a specific example of a middle binder. And that's why she said this evidence would be cumulative, because they could make the same argument, they did make the same argument, without specific examples. She then explained that it would also be confusing to the jury, because the jury would then be in a situation, especially with the accused product then in front of it, where it would naturally be inclined to compare. I understand, and those are transcript sites you gave us, but the memorandum order here, excluding the evidence, it's at 1030, the appendix, seems to me to be entirely based on her conclusion that the case law compelled her to exclude the evidence. It was all a legal argument, citing Hogan and Abbey and some other cases, I guess. The initial rulings. Am I wrong about that? And I agree with you that, if that's all there was, I would agree with you so far. This is the important thing. Before trial, she issued the two written opinions that cited the cases. During trial, when they kept trying to put this evidence in anyhow. And you were trying to put in some evidence, too, right? I was confused in the transcript whether or not she was talking about your evidence sometime or their evidence, right? Our evidence was excluded before trial, along with their evidence. During trial, when they kept fighting this, and here would be one example, appendix page 1001, the very bottom of it, when the court was then revisiting this, she says, but again, this is an evidentiary question, not the general question that was reviewed by the Federal Circuit in all the cases they cited, including the Abbey case. I understand the principles. The question is how defendants tend to use it. She then goes on there, and then especially again on pages 11, 56 to 57, and in a couple other places cited in her brief, to then treat this as a more nuanced, as an evidentiary question as you saw the evidence coming in. And her opinion was that first this is cumulative, she said cumulative, because you don't need it to prove the absence of something. If you want to say that there are other amino acid sequences that aren't here, you don't need specific examples. If you want to say there are bonding sites that aren't disclosed in here, you don't need specific examples. But if the question is, as I think you acknowledge it is, or at least can be, whether you have shown a sufficiently representative number of examples covered by your claimed class, representative of something or other, I'm not quite sure yet what, why is it not important for the other side to be able to walk in some detail through an example to show, to be persuasive, look at just how different at the molecular level this is from that. Now, unless you're going to tell me the molecular level is really, really completely unimportant, and that's why I keep asking about what it means to be representative, because I'm not sure until I know the answer to that, how to evaluate the significance of the evidence that they were barred from putting up. Right, and we're talking about, generally speaking, representative of the diversity of the species within the genus, which I know is a fairly high-level statement, but that's why the application in any factual context is going to depend on the facts. And the testimony from Amgen's experts, this was disputed at trial, is that what's important is the three-dimensional structure. That's what affects binding. That's what affects blocking. Diversity in amino acid sequence beyond that is not important, and because you can have vastly different amino acid sequences that have exactly the same important common structural features. So for example, two of the antibodies, just to give you two pieces of evidence, two of the antibodies that are specifically disclosed in the patent are more than 50% different in terms of their amino acid sequences, but they co-bind, meaning they bind at the same area. Similarly, and that's at appendix pages 1276, 1162, Dr. Rees also gave an example of another situation based on Australian research, where antibodies with vastly different amino acid sequences had the same common structural features. The reason is this. If you write out the string of amino acids, what's important is then how they fold into a three-dimensional shape, and only some of the amino acids have anything to do with how it folds into a three-dimensional shape or with the chemical complementarity at the end. Which is why you can have two that are more than half different, but still have the same relevant characteristics. Why shouldn't they have been able to show that their particular version or any other specific examples that they were able to dig up, whether it was the accused one or anybody else's, Lilly's or somebody else's, fold really, really quite differently and yet bind to at least one of these 15 amino acids on PCSK9 and have the effect of blocking PCSK9 from binding to the liver receptor? Sure. Because one, it is cumulative, because they could still make that argument without a specific highly prejudicial example of a post-priority antibody. The district court made no conclusions about it being highly prejudicial. I think she said it was confusing, right? Right. She said it would be, quote, confusing. There's a big difference between confusing and highly prejudicial. I mean, confusing was because she said, well, you stipulated to infringement, so it would confuse the jury to bring this evidence in. Well, the rationale for confusing, I believe the court's understanding of why it would be confusing, is that the question is if it's, and this again is at page 2018, I think it combined with cumulative, which is that if you're looking at what happened after the fact, after the fact, after the fact, it's normally not considered relevant. U.S. Steel, for example, held that it doesn't matter whether subsequent antibodies are discovered without these wildly different properties because Section 112 was determined at the time of the invention. Well, that's her legal, that's the legal issue that's presented. That's the relevance. But even then, if you want to put in more evidence, it's not only cumulative confusing, it's also, remember, it was even-handed because before trial, they persuaded her to exclude Amgen's evidence that one of the antibodies specifically disclosed in the patent was in fact a middle binder. That was Amgen's evidence. One of them in the patent was a middle binder, the characterization that it was a middle binder just didn't come until afterward. Once they got her to exclude that, she thought during the trial, as a matter of trial management discretion, that she couldn't let them put in contrary evidence, having already excluded ours. And especially under this Rule 403 balancing, she doesn't have to use the numbers 403 under this balancing against cumulative and prejudicial, cumulative versus confusing, and then also even-handed to both sides. This is a review for even higher than abuse of discretion. The question is whether it's an arbitrary or irrational decision on the facts of the case under the- Where's the site to where she talked about how she had already excluded yours so it would be prejudicial? Yeah, she- that comes in also on page 1157 of the Joint Appendix as one of them, transcript page 219, going down around line 21, if I let them- if I let this in, then in all fairness I've got to let Amgen rebut it. And then she explains over and then continues on to transcript page 222 where she says, you know, I'm being swept away into yet another quagmire, where, again, she had already issued an even-handed ruling, even-handed decision. This is during the trial. And once they moved to exclude Amgen's evidence at one point and succeeded on that, she understood, as a matter for discretion, considerable discretion under Third Circuit law, she didn't see any reason to go back on that. Now in terms of- in terms of the disclosure, if there is emphasis, everything that was disclosed here, it's not just the 15 epitopes on the sweet spot. The disclosure is of several different things that all have to be considered together. And also, of course, we agree on Jamal. It's clearly waived because there's nothing resembling a Rule 50A motion. And that's the holding of Duralast, that as a matter of law, no 50A motion, no Jamal. It's a very fundamental precept that protects, among other things, as Duralast explained in the Seventh Amendment. If you're going to challenge whether a fact question goes to a jury, you have to do that before it goes to the jury. But on the facts of Jamal, and again, it's the testimony of Drs. Reese and Pesco that is- that's so important here, I would encourage you to take a close look at it. But the disclosure here is of several different things. First, you have the 24 rep- not just two, 24 representative antibodies. Those bind- the testimony is that those bind across the sweet spot. They talk about edge binders. What that means is that each of them touches contrary edges, but they also almost come together in the middle. They cover the sweet spot virtually perfectly. Is that what makes them representative, that collectively they cover most of the territory on the binding region of the PCSK9? It's an important point, and part of it. You have a very small region of PCSK9, and you have these different- these 24 amino acids that factually you can determine they are representative because they all have the common structural features, and they cover nearly the entire sweet spot. They also represent seven different gene families, and the expert testimony is that there is considerable sequence diversity there, that this amount of diversity is extensive. I'd also point out it's far more extensive than any other antibody case that this Court has ever seen, at least in one that's written in opinion. So if this isn't sufficient, then what- then the upshot of their position seems to be you can never have meaningful pattern protection for antibodies, which may be the most important takeaway here. Because if antibody claims were limited to specific amino acid sequences, it'd be all but worthless, because the power of antibody technology is such that once you have what Amgen set forth here, 24 specific examples, a description of how to go make many more, and a comprehensive roadmap, as Dr. Reese testified, for how to use those 24 to go make thousands of others, then what you have is a situation where it would be- it's always easy once some- where it would be easy for someone to take the disclosures of the patent, the high level skill in the art, and then just go make some that are materially the same except they have different amino acid sequences. At that point, this life-saving body of research would dry up, because no one could spend two billion dollars to develop a product if others could work around it that easily. That's part of what the well-characterized antigen test reflects. A couple points on that. First, this court expressly, quote, adopted it as, quote, precedent, as the court indicated in Noel. And second, the scientific basis for it is absolutely right, because, as this court explained in Noel, it reflects the well-known structural characteristics of antibodies, the nature of antibody-antigen binding, and then the high level of skill in the art. So, in terms of structure, you know if it's a monoclonal antibody, it's going to have this basic structure. In terms of binding, you then know that the important variable part, the business end of the antibody, if once you have newly and well-characterized the antigen, which was done here, you then know it's the mirror image of this, the two pieces of a three-dimensional jigsaw puzzle. And then, armed with, especially the disclosures of the patent, and then also the very high level of skill in the art, as of this point in time, people can then just go and make others. And it was also said that Amgen, after the fact, was still doing the same sort of essentially blind screening that was before. Not true at all. Here's what the patent actually discloses in terms of the comprehensive roadmap. There are a couple things that Dr. Reese testified to on this. First is that the patent discloses you can take one of the 24 representative antibodies and use it as a reference antibody to screen others. So instead of screening others blindly, you take others and see if they bin with this one, if they can both bind at the same time. If not, then they have overlapping binding sites, and that's shown in example 10 of the patent. Then, if you want to confirm that it really does bind to the sweet spot, example 3 of the patent shows you how to then do a blocking test to confirm whether the new antibody would, in fact, cause the requisite blocking. And if you want to know exactly which residues it binds to within the sweet spot, you then do alanine scanning under example 19 of the patent. The other approach is to take one of these and make minor changes to it, which is especially where the ready evasion would come in if patents were as limited as they want them to be. There are two ways described according to Dr. Reese and in the patent itself for that. The first is conservative substitutions. There are formulas and algorithms in the patent where you can substitute, say, I'll take out an amino acid and put in another one. According to the formula, you know that will still work. That would get you out of the claim scope that they say is all you can have. There's also then CDR shuffling, which essentially means you take two reference antibodies and mix and match their parts according to formulas to get other antibodies that would work. And Dr. Reese testified that doing that, you can create thousands of other antibodies. Antibody protection, if that would get around a valid antibody patent, especially an extensive disclosure here, it would be worthless. The area of research would have to dry up because you can't spend billions of dollars if you're not going to get meaningful patent protection. I'm going to stop you there. Can I just ask one more question? Sure. I'm sorry. This is very, very, very simplistic, but given everything you've just described about what the patent describes about how to do this and the like and how it all operates and things like that, am I understanding you, and if I'm not, then let's just move on because I don't want to get into the whole big mess, that your view is on this evidentiary issue, the fact that they can bring in different types of structures where they can point to they only have overlapping things and 20% versus 90% of the stuff is irrelevant because they all still operate in the same way. Sorry, I'm not sure exactly what the 20 or 90% is, but- Of the, I guess, amino acids. I think it was some kind of example he used. Yeah, sorry. It's the, all of the, the point- What they were trying to get in, the kind of evidence. Let me get rid of the 20 over 90%. They have evidence that they wanted to get in that they show this structure is so substantially different from yours that you haven't shown proper written description for the entire genus. Is your point that that structure is irrelevant to the written description claim of how this all works? Well, it's, the amino acid sequence is irrelevant because what matters is the actual structure of the business end of the antibody, which is not dictated. You can have vastly different amino acid sequences with the same structure, is one point. The other point, though, is that they were able to argue, as the district court said, it's cumulative. You can argue these points. You don't need specific examples to do that, which is at least within her considerable discretion. And then the other thing they wanted to put in, apart from the post-priority examples, sorry, I'll wrap it up, is this evidence of Amgen's third generation program where they said that showed that Amgen later on was seeking a middle binder. But remember, she had already excluded Amgen's evidence that the patent included a middle binder. Thank you. I'll give you five additional minutes if you need it. Thank you, Your Honors. Just a few points in rebuttal. First of all, Judge Toronto, I think I gave my friends on the other side too much credit because Novartis had already disclosed 12 of the 15 amino acids on the binding site. If you mind leaving those out for a second, because I'd just like to make use of them. So they'd already disclosed 12 of the 15. So what this really added as to the structure of this was three more amino acid sites. But the reason I wanted to keep these out is this isn't the invention. It's fine that they described three amino acid sites here that nobody knew about, but this isn't what they're claiming. This isn't what they're claiming either, at least not exclusively. To the extent this is Repatha, they claim that in a separate patent by amino acid sequence, which is the way most people do it in this space, they can have it. We have no beef with this. The problem is that this courtroom should be filled with a nearly infinite number of these yellow things with pink on them, because that's how many are in the genus they claim. And they completely precluded us from showing that the structure, which again is not functioning. The fact that something has the pink site might mean it has the function of binding, but the structure could be very different. I mean, they all have the basic Y shape and everybody knows that. Were you precluded from having your expert testify that there were an infinite number of such structures, or were you merely precluded in saying, here is an example that happens to be ours, look at this? Our expert, we didn't have to have our expert say that there were a nearly infinite number of antibodies in the genus, because that came from their expert, Dr. Petsko. So that was before the jury. But this gets to this issue of sort of cumulativeness or effect. I mean, this is being argued to a jury. A jury is being told that there's this sweet spot and we have one species that we've disclosed that parks here and one that parks on the other side, and to a jury that's not told that there's something else, that looks pretty representative. The fact that they're edge binder seems like a good thing, because they're on both edges. What could be more representative? Of course, if we were allowed to come in and show that, no, actually there are multiple other antibodies that have been independently developed that have very different structural characteristics. And they may not have this exact Y shape, because they may fold a little different, but in all events, they bind in a very different place. And then if we were allowed to tell you what everybody in this field thinks of is part of the structure, which is the amino acid sequence, then, I mean, I love my friend's phrase, the business ends of these things, because that's exactly what our testimony focused on. And it showed that on the business end of prelulant, there was only 26% overlap in the amino acid sequence. That's what we wanted to show the jury. Now, in terms of what would be most effective for the jury, would it have been 26%? Would it have been the fact that it parked right in the middle? I'm not a trial lawyer. I can't tell you that. Can I just ask this question? I guess I'm confused. The district court seemed to draw a line between post-priority date evidence and pre-priority date evidence. Did there exist, and were your experts allowed to testify, that there existed structures that would meet the claim limitation, and that they would bind, but they would look very, very different, and maybe even bind on different, the middle as opposed to the wings? Were you not able to put in evidence that many, many different structures, looking very different, would satisfy the claim? I mean, our experts may have been able to say something about that, constrained by the same post-priority ruling, which is fundamentally wrong, and if I can address that for a second. I mean, we all know a false consistency is the hobgoblin, etc. I mean, Ariad specifically says that there's a problem with an inventor putting in post-priority evidence to make the written description something that it wasn't at the time. But nothing in AbbVie or common sense suggests that if you have something that's in the claim genus, that structurally looks completely different from the only two disclosed species, that you can't get that before the fact finder. And in AbbVie, there was an unresolved issue about anticipation. The court, you know, if there really were this cliff you fall off of, if it's post-priority, there's no way the court in AbbVie would have considered that and made it the focal point of its decision at page 1293. And the way I think about it is this, which is if you had something that was in the claimed genus that was pre-priority, that would give you both an anticipation argument and a darn good argument that the disclosed species were not representative of the structure of the whole genus. If you have one of those that comes into being afterwards, it no longer shows anticipation, but it's every bit as relevant as showing that at the time of the priority date, the written description showed something that they just didn't possess, because they need to show structure. Structure is not function. Binding at the site is the function that they've claimed. It's not structural. What's structural in this context is amino acid sequence, and we're not trying to limit them just to the amino acid sequence, though that is how they principally claimed Repatha, and that is how we principally claimed Preleulent. As I pointed out in my opening argument, you can claim a genus if it's a genus of thousands, and that genus, if it's based on what you've disclosed in 95% homology, will avoid all of this substitution my friend talked about in evasion. That's the way you can claim a genus where you actually have a species that's representative, but you can't claim a nearly infinite genus based on a description of the epitope and two disclosed species. If I could just make two other points in rebuttal. My friend on the other side said that you don't have to invoke the number 403. Well, the Third Circuit in the Glass decision says that you do, and you have to do the balancing before you could exclude the evidence. As the Chief Judge indicated, I don't see how you could say that allowing us to disclose a radically different structure would be unduly prejudicial. In the context of a trial where they have these two yellow things that represent their two disclosed species and we can't put on ours, that's Hamlet without the prince. That is not cumulative. That would have made a huge difference both in a court of law, but especially in front of a jury. The last point I want to make is, I actually really would like to just invite you to read Duralast, because Duralast is a case that both involves a formal 50A motion that just omits one legal argument, and this court also said that because what was omitted was obviousness, it was going to apply its own law and not the circuit law, which Duralast itself recognized was more lenient. So Duralast is our case. So the point I wanted to end on is simply this. This whole idea that there is an antibody exemption I think is fundamentally misconceived. There isn't any antibody exemption in the relevant statute, and the rule here should be the same for large molecules as it is for small molecules. Nobody thinks that one company gets to make every statin just because they discovered the binding site. Nobody thinks that there should only be one AIDS protease inhibitor on the market just because one company described the binding site. Nobody thinks there should only be one COX-2 inhibitor on the market. The rule shouldn't be any different in the antibody context. Somebody, whether it's Amgen or Pfizer, whose product ended up not working as medicine, should not be able to corner the market on PCSK9 inhibitors just because they described an additional three amino acids on the binding site and came up with two species that aren't representative of the entire genus claimed. Thank you. We thank both sides, and the case is submitted. That concludes our proceedings. All rise.